# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 512 | **DATE** | 2/5/2001 |
| **CASE TITLE** | LA BARGE vs. LIFE INSURANCE COMPANY OF NORTH AMERICA et al | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ■ Status hearing set for 27 FEB 01 at 10:00 A.M.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Pursuant to Memorandum Opinion and Order entered this day, this court enters findings of fact and conclusions of law in favor of plaintiff and against defendant. Defendant's motion for summary judgment on the administrative record is denied and plaintiff's motion for summary judgment is moot. Defendant is liable plaintiff for the payment of policy benefits plus attorney's fees and costs. All pending motions are moot. All previous dates and schedules are moot. If the parties cannot reach an agreement on the final judgment amount, the court will set a schedule at the February 27, 2001 status hearing

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | FEB - 6 2001 | 27 |
| | Notified counsel by telephone. | date docketed | |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 2/5/2001 | |
| | | date mailed notice | |
| JS | courtroom deputy's initials | 01 FEB -6 AM 7:47 | |
| | | Date/time received in central Clerk's Office | JS mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BARBARA LA BARGE, )
)
Plaintiff, )
) No. 00 C 0512
v. )
)
LIFE INSURANCE COMPANY OF, )
NORTH AMERICA, )
a CIGNA COMPANY, )
)
Defendant. )
)
)

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

Plaintiff Barbara LaBarge ("LaBarge") filed a single count complaint on January 26, 2000 seeking an award of disability benefits pursuant to an insurance policy underwritten by defendant the Life Insurance Company of North America ("LINA"). This complaint seeks recovery under §502(a)(1)(B) of the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1132(a). On September 9, 2000, LaBarge filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and requested in the alternative findings of facts and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. On October 31, 2000, LINA filed a motion for judgment on the administrative record pursuant to the holding in Kearney v. Standard Insurance Co., 174 F.3d 1084 (9th Cir. 1999)[1]. On November 13, 2000,

---

[1] Opinions of the United States Court of Appeals for the Ninth Circuit are not precedent for district courts in the Seventh Circuit. Opinions of other circuits, however, can be instructive

1



LaBarge filed a motion to strike LINA's motion for judgment on the administrative record. On December 1, 2000, LINA filed a motion to strike evidentiary materials submitted by LaBarge in her reply to LINA's Local Rule 56.1(b) statement. Both motions to strike are DENIED. Having considered all of the admissible evidence submitted by the parties, including the administrative record, this court finds the facts and the law in favor of LaBarge. Therefore, LINA's motion for judgment in its favor on the administrative record is DENIED and LaBarge's motion for summary judgment is MOOT. This court pursuant to Rule 52 of the Federal Rules of Civil Procedure finds the following facts and states its conclusions of law as set forth below pursuant to a de novo, plenary review of the case.

## FINDINGS OF FACTS

A. <u>Barbara LaBarge and Midas International</u>

1. LaBarge was born on April 18, 1942 and at all times relevant to this litigation a resident of Berwyn, Illinois.

2. LINA is a corporation doing business throughout the United States and within the geographical area encompassed by the United States District Court of the Northern District of Illinois.

3. LaBarge was employed by Midas International ("Midas") as a data entry operator from February 24, 1969 through September, 1998.

4. As an employee of Midas, LaBarge was covered under Midas's long-term disability plan which was funded through an insurance policy issued by LINA.

5. As a data entry operator at Midas, LaBarge needed the ability to repeatedly move her hands, arms,

---

if the Seventh Circuit has not spoken on the subject.

and neck, to read and process documents, and to flip pages.

B. LaBarge's potential benefits under LINA

6. The LINA long term disability policy ("Policy") provides monthly disability benefits pursuant to a formula based principally on a claimant's earnings prior to disability.

7. Long term disability benefits are paid by LINA under the following formula: the lesser of (A) 60% of the employee's basic monthly earnings (rounded) or (B) $25,000 minus the benefits from certain specified sources such as Social Security disability payments and employer retirement plan benefits, which when added to the LINA policy's monthly benefit amount, exceeds 70% of the employee's basic monthly earnings at the time the employee became disabled.

8. LaBarge's basic monthly earnings equal $3,000.00 (rounded).

9. Long term benefits commence for an individual after short term monthly benefits have been paid for 150 days.

10. After 150 days an individual already on short term disability payments qualifies for long term disability if he or she is still unable to perform all the material duties of any occupation for which he or she is or may be reasonably become qualified based on their education, training or experience.

11. The LINA long term disability policy, expressly limits monthly disability benefits to 24 months if a nonhospitalized claimant's inability to work is caused by or contributed to by, among other things, mental illness.

C. La Barge's Disability and Subsequent Claims to LINA

12. On October 9, 1998, LaBarge left work as a data entry clerk with Midas due to chronic obstructive pulmonary disease.

13. After LaBarge left work, she began receiving short term disability benefits from Midas based

on her application for benefits signed by LaBarge on October 28, 1998. LaBarge's application was supported by a certificate from her attending physician, Dr. M.F. Stefancic, M.D.

14. On December 18, 1998, LaBarge filed an application for long term disability benefits. On the application she claimed that she was unable to work because she had emphysema which resulted in a shortness of breath.

15. LaBarge's long term disability benefits would have started March 13, 1999 if she qualified for coverage.

16. On March 25, 1999, LINA advised LaBarge that her application for benefits had been received but that her medical records had not yet been obtained. LINA requested additional information from LaBarge and Dr. Stefancic in order to promptly process her application.

17. On March 29, 1999, LINA sent LaBarge a letter denying LaBarge's claim for benefits without receiving the additional information requested from LaBarge. In that letter of March 29, 1999, signed by Audri Mayo, Case Manager, LINA stated that it had obtained information from Dr. Stefancic, Geraldine Piorkowski, Ph.D., Clinical Psychologist, and a Dr. Dorf.

In its letter denying benefits, LINA quoted a single line from Dr. Piorkowski's report which stated that LaBarge's disability would be based on her physical status and not on psychological findings. The letter articulated that Dr. Dorf found that LaBarge suffered from mild chronic obstructive pulmonary disease. The letter summarized the tests run by Dr. Dorf and the tests run by Dr. Stefancic. The letter concluded that LaBarge's impairments were not severe enough to prevent her from performing her position as a data entry clerk.

18. LaBarge appealed this decision, and submitted a "Disability Questionnaire" on March 30, 1999 in support. In this questionnaire, LaBarge described her inability to work due to labored breathing,

the side effects from inhalers and medicine, exhaustion, acute anxiety, sleeplessness, depression, dizziness, and light headedness. LaBarge also described her not being able to drive her car because of her panic attacks. In addition, LaBarge submitted two open letters to Audri Mayo, Case Manager giving specific and detailed descriptions of her daily life.

In these letters dated April 9 and 11, 1999, LaBarge talked about her fatigue, her pain, her anxiety, her depression, her daily activities, as well as her mental and physical history. Additional medical reports in support were sent in by Dr. Stefancic, Dr. Piorkowski, and as well as new reports were sent in by Dr. Michael J. Waligora, a cardiologist who examined LaBarge on the referral of Dr. Stefancic and Dr. Gay, a second cardiologist, who also examined LaBarge on the referral of Dr. Stefancic.

19. In a letter date August 23, 1999, signed by Stephanie Abrom, Case Manager, LINA reaffirmed its original decision to deny LaBarge benefits. That letter restated the same findings previously mentioned in LINA's March 29, 1999, letter and concluded that although LaBarge had some medical problems, those problems were not debilitating. The August 23, 1999, letter rejected LaBarge's subjective complaints articulated in her open April, 1999, letters and in her March 30, 1999, disability questionnaire.

20. On September 8, 1999, LaBarge was fired by Midas as a result of her re-denial for long term disability benefits by LINA.

21. After the August 23, 1999, denial, LaBarge through counsel this time appealed to LINA again. Supplemental reports were sent in by Dr. Stefancic, Dr. Piorkowski, Dr. Gay and Dr. Waligora. In addition, LaBarge submitted to LINA the decision of the Social Security Administrator, who deemed LaBarge to be disabled.

22. In a letter dated January 14, 2000, signed by Kendra K. Stephens, Case Manager, LINA stated that since LaBarge had not submitted any additional information to support a finding of her being disabled, LINA had no choice but to reaffirm its original decision to deny LaBarge long term disability benefits. In this letter, LINA stated that LaBarge had exhausted all of her administrative remedies with its offices.

23. LaBarge's file was reviewed by a Brenda Jackson, R.N., Stephanie Abrom, a case manager, Gracie Gunther, a supervising claim manager, and Audri Mayo, a case manager. No medical doctor reviewed any of LaBarge's applications or appeals, or examined, or questioned Labarge on behalf of LINA.

### D. LaBarge's Treating Physicians' Reported Findings

24. On November 1, 1998, Dr. Stefancic stated in a questionnaire titled, "Midas International Corporation Application For Disability Income Benefits" that LaBarge suffered from emphysema causing "severe shortness of breath/cough." When asked in the questionnaire when LaBarge would be able to return to work Dr. Stefancic answered: "indefinite."

25. On January 12, 1999, Dr. Stefancic reported, on a form titled "Respiratory Report," submitted to the Bureau of Disability Determination Services and used to determine LaBarge's eligibility under the disability provisions of the Social Security Act, that LaBarge's current diagnosis was chronic obstructive pulmonary disease ("COPD") as of his last visit with LaBarge on December 17, 1998. Dr. Stefancic stated that LaBarge had severe "SOB" [shortness of breath], cough/wheeze, and sputum that interfered with all activity.

26. On February 9, 1999, a telephone conversation with Dr. Stefancic was recorded by Stacey Bolin, Disability Claims Adjudicator for the Bureau of Disability Determination Services. In that

conversation Dr. Stefancic stated that he last saw LaBarge on January 15, 1999. Dr. Stefancic stated that the medication he had prescribed for her pulmonary condition was not helping, and that he would be referring LaBarge to a pulmonologist if she did not improve. Dr. Stefancic stated that LaBarge's hypertension was being controlled by medication as well as her irritable bowl syndrome and hyperlipidemia.

27. Finally, in a letter dated March 24, 1999 to Audri Mayo, Case Manager at LINA, Dr. Stefancic stated that LaBarge was quite short of breath with minimal activity, with minimal response to inhalers. In addition, Dr. Stefancic stated that LaBarge suffered many side effects with the use of inhalers. Dr. Stefancic represented to Mayo that LaBarge was being referred to a pulmonologist for advice in managing her chronic obstructive pulmonary disease. Dr. Stefancic stated that LaBarge was depressed and on PROZAC, as well as having exceptional "burning" in her chest. Dr. Stefancic stated that despite LaBarge having only a mild airway obstruction on pulmonary function tests, LaBarge was nonetheless short of breath due to other physical complications.

28. On June 16, 1999, Dr. Waligora wrote to Dr. Stefancic and reported that LaBarge was a very anxious, 57 year old, obese, white female who had marked inspiratory and expiratory wheezing while talking. Dr. Waligora described LaBarge's medical history as "complex," which included COPD, pneumonia, colon polyps, and anxiety. Dr. Waligora stated that LaBarge complained of significant dyspnea on exertion walking one block, but that LaBarge had recently stopped walking this distance because she feared she had significant heart troubles. Dr. Waligora stated that LaBarge noted significant lower extremity edema over the past several weeks. Dr. Waligora narrated LaBarge's previous medical history which included whooping cough as a teenager which resulted in hospitalization and a partial lobectomy, and malignant colon polyps which are treated with a

colonscopy every several years. Dr. Waligora stated that LaBarge was a former smoker who smoked two packs of cigarettes a day for forty years. Dr. Waligora concluded that LaBarge did not have a major problem with her heart. Dr. Waligora found that her stress test was incomplete due to her inability to reach her target rate, but that her exercise time of nearly 6 minutes excluded significant coronary artery disease. Dr. Waligora stated that her hypertension was very poorly controlled and certainly contributed to dyspnea on exertion. Dr. Waligora stated that her lower edema is most likely related to diastolic dysfunction of LaBarge's ventricle in combination with her emphysema.

29. On March 18, 1999, Dr. Piorkowski reported in memo to Audri Mayo, Case manager, that LaBarge suffered from generalized anxiety disorder showing moderate symptoms of anxiety, including panic attacks. Dr. Piorkowski also stated that LaBarge lacked social support to help moderate her anxiety and subsequent panic attacks. Dr. Piorkowski stated that LaBarge suffered from anxiety and panic attacks because of her worrying about her physical status. Dr. Piorkowski reported that LaBarge had labored breathing and rapid speech, becomes fatigued easily, and does a limited amount of physical activity each day. Concerning treatment, Dr. Piorkowski recommended a reduction in her overall stress, assistance to help LaBarge become more comfortable with physical limitations, and an expansion her social network. Dr. Piorkowski suggested using therapy, relaxation techniques and cognitive statements. Finally, in answer to a question posed by Mayo concerning LaBarge's ability to work, Piorkowski replied, "Work planning would be based on physical status, not on psychological findings."

30. In a psychiatric report submitted to the Bureau of Disability Determinations services dated January 19, 1999, Piorkowski reported the LaBarge showed up for an appointment on January 15, 1999 dressed in casual neat clothing, walking slowly with labored breathing. Dr. Piorkowski

reported that LaBarge could take care of herself, bathing, cooking, eating, and cleaning up dishes. Dr. Piorkowski reported that LaBarge could only do one project per day, like cleaning one room due to her physical limitations. Dr. Piorkowski reported rapid speech patterns, and reported that LaBarge was capable of understanding, carrying out and remembering instructions as well as responding appropriately to supervision.

31. On June 8, 1999, Dr. Piorkowski reported that since her last report of January 19, 1999, LaBarge's emotional condition had deteriorated. Dr. Piorkowski reported that LaBarge was depressed, suicidal, and hopeless about her condition. Dr. Piorkowski reported that LaBarge complained of pronounced breathing difficulty, burning pain in her chest and panic attacks related to her physical condition. Dr. Piorkowski ended her report by stating that "[t]he combination of external factors and psychological vulnerability, brought on by a history of severe stressors, including alcoholic parents, has left [LaBarge] with limited coping resources."

32. In a memo to Cigna Insurance, dated September 30, 1999, Dr. Piorkowski offered a narrative of LaBarge's mental history. Dr. Piorkowski stated that LaBarge had been an intermittent patient with her since 1982. Dr. Piorkowski stated that in 1982, LaBarge suffered with bouts of depression and anxiety and was socially isolated. Dr. Piorkowski stated that LaBarge had a chaotic family history of alcoholism, neglect and abuse. Dr. Piorkowski reported that LaBarge's physical limitations have made it impossible for her to initiate and maintain social contact, thereby increasing her social isolation and anxiety. Dr. Piorkowski reported that LaBarge continued to suffer from depression, which includes crying spells, hopelessness, and suicidal tendencies, despite being on PROZAC. Dr. Piorkowski stated that LaBarge was very fearful of dying alone with no one to tend to her needs, which resulted in intense panic attacks whenever her breathing became impaired. Dr.

9

Piorkowski observed that LaBarge appeared fatigued and that LaBarge strained to recover her strength after the brief walk to the office. Dr. Piorkowski concluded that the combination of physical pulmonary distress, limited stamina, and long-standing psychological vulnerability left LaBarge with few coping resources. Dr. Piorkowski asserted that based on her observations and previous reports it was very apparent to her that LaBarge was disabled and unable to be employed.

33. In a written and signed report, dated September 28, 1999, Dr. Gay described how LaBarge was suffering from four separate pulmonary/respiratory impairments: 1) Asthma, 2) Emphysema, 3) Chronic Sinusitis, and 4) Laryngeal Dyskinesia. Dr. Gay explained that although pulmonary function testing would classify LaBarge as suffering from a mild obstructive ventilatory defect, she "experiences significant airway hyperactivity and irritability." Dr. Gay stated that this irritability manifests itself with severe broncho spasms and airway obstruction with significant respiratory compromise upon exposure to inhaled allergens and with physical and psycho social stressors.

Dr. Gay reported that evidence of hyperinflation limited LaBarge's exercise tolerance and that chronic sinusitis worsens LaBarge's "airway irritability." Finally, Dr. Gay reported that LaBarge suffers from laryngeal dyskinesia where paradoxical motion and action of her vocal cords leads to airway obstruction and can precipitate an exacerbation of her asthma. Dr. Gay stated that his concern with LaBarge's laryngeal dyskinesia was that it was directly related to the amount of physical, emotional and psycho social stress that LaBarge comes in contact with and perceives. Dr. Gay articulated that LaBarge's condition could be controlled in a relatively low stress environment, with training from a speech therapist. Dr. Gay warned however that as LaBarge experiences more stressful environments her conditions will be exacerbated. Dr. Gay concluded that LaBarge's multiple respiratory conditions are controllable with medication and therapy in low stress

10

environments, but that increases in her psycho social and emotional stress, such as driving long distances in heavy traffic, monetary concerns, or the rapid meeting of work deadlines would easily worsen her respiratory function.

### E. LaBarge's Social Security Benefits Claim

34. At the same time that LaBarge was applying for benefits from LINA, LaBarge applied for disability benefits from the Social Security Administration ("Administration"). This claim resulted in a determination by the Administration dated September 24, 1999, that LaBarge was disabled and met the qualifications for an award of disability under the Social Security Act.

35. The Social Security Administration found in a "Senior Attorney Advisor Decision" dated September 24, 1999, that LaBarge suffered from chronic obstructive pulmonary disease, hypertension, hyperlipidemia, irritable bowel syndrome, panic attacks, and major depression.

36. In making this decision, the Administration relied upon the opinions of Dr. Stefancic, and Dr. Piorkowski.

37. The decision stated that LaBarge's physical impairments significantly limited LaBarge's ability to perform basic work activity and were considered severe under Social Security Regulations.

38. The Administration found that LaBarge's physical impairments restricted LaBarge in her activities of daily living, and in maintaining social functioning.

39. The Administration, found that LaBarge's physical problems also caused the deterioration of LaBarge's mental condition. The Administration also found that LaBarge was significantly compromised in her ability to perform the mental aspects of routine, unskilled work activity by major psychiatric complications.

40. The Administration found LaBarge deficient in her ability to concentration, in her persistence

11

and in her pace setting which resulted in her inability of LaBarge to complete task in a timely manner.

41. The Administration rejected its previous decisions denying LaBarge benefits. The Administration stated in its opinion that it rejected its previous decisions concerning LaBarge because those opinions were rendered by physicians who never had the opportunity to examine or question LaBarge. Furthermore, the Administration found that its previous decisions conflicted with the opinions of doctors who actually treated LaBarge. The Administration found that the opinions of treating doctors were more reliable than any other opinion.

42. The Administrations found that LaBarge had been disabled since September 3, 1998.

## CONCLUSIONS OF LAW

1. This matter arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. (ERISA); and constitutes a claim for employee benefits which may be brought pursuant to 29 U.S.C. § 1132(a)(1)(B).

2. This court has jurisdiction over this action under Section 502(a) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a).

3. The court also has general subject matter jurisdiction over this matter. 28 U.S.C. § 1331.

4. Venue is proper in this district. 29 U.S.C. § 1132(e)(2).

5. Standard of Review: Section 1132(a)(1)(B) of ERISA empowers courts to review the eligibility decisions of employee benefit plan administrators. The proper scope of a court's review under ERISA is determined by the language of the benefit plan at issue. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). In Firestone, the Supreme Court held that an administrator's decision to deny benefits should be reviewed de novo "unless the benefit plan gives the administrator

... discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Id. An ERISA plan is a contract, "and the meaning of a contract is ordinarily decided by the court, rather than by a party to the contract, let alone the party that drafted it." Herzberger v. Standard Insurance Co., 205 F.3d 327, 330 (7th Cir. 2000). Therefore, plenary review of the decisions of the plan administrator is the default, and any uncertain language in the contract concerning the scope of judicial review will result in plenary review by the court. Id. In other words, unless specifically worded otherwise, a court shall review the decisions of a plan administrator de novo without any deference given to the findings of fact or conclusions drawn by the administrator. See Herzberger, 205 F.3d at 331.

In this case, LaBarge argues that the LINA policy applicable to her claim shows no language of discretion given to the plan's administrators. LINA does not dispute this interpretation. As a result, this court will review the decision of LINA de novo without any deference given to LINA's previous decision. In addition, while reviewing the decision of LINA, this court will not be limited solely to the administrative record, as this court would be if this court was to conduct a deferential review of the administrator's decision. See Perlman v. Swiss Bank Comprehensive Disability Protection Plan, 195 F.3d 975, 981-82 (7th Cir. 1999). LINA's motion for judgment on the administrative record requests that this court limit its scope of review to the administrative record and enter judgment based on that evidence only. LINA's motion is denied because the language of its insurance plan provided to MIDAS employees calls for a de novo review. Therefore, this court will consider all of the arguments and evidence presented to this court in the record in its de novo review of LINA's decision to deny LaBarge disability insurance benefits, including but not limited to the administrative record.

13

6. The evidence establishes that LaBarge suffers from chronic obstructive pulmonary disease, hypertension, hyperlipidemia, irritable bowel syndrome, panic attacks, and major depression.

7. The evidence also establishes that LaBarge's ailments impose limitations and restrictions on LaBarge that prevent her from engaging in any substantial gainful activity.

8. Every physician that has examined LaBarge, specifically Dr. Stefancic, Dr. Piorkowski, Dr. Gay, and Dr. Waligora have all submitted several reports and medical records and all attest to LaBarge's disability.

9. No physician that has examined or questioned LaBarge has produced evidence which contradicts LaBarge's claim of being disabled.

10. The findings of the Social Security Administration is compelling evidence of LaBarge's disability. In Pierce v. American Waterworks Company, Inc., 693 F.Supp. 996 (W.D. PA. 1988), a favorable social security outcome, coupled with a treating physician report affirming disability entitled the claimant to a long term disability award under an ERISA plan. Similarly in Kirwan v. Marriott Corporation, 10 F.3d 784 (1st Cir. 1994), the court ruled that a social security decision may be considered by a court reviewing an ERISA claim for disability benefits.

11. The key issue this court must determine is whether LINA rightfully denied LaBarge long term disability coverage, in light of all the medical evidence presented by LaBarge's doctors and in light of the Social Security ruling.

12. The court concludes that LINA's decision to deny LaBarge long term disability coverage is without factual basis on the record. LINA's decision is against the great weight of the evidence in the record and judgment in favor of LaBarge and against LINA is necessary as a matter of law.

13. At the time LINA made its final denial of LaBarge's claim, LINA had all of the opinions from

14

all of LaBarge's treating physicians, all of LaBarge's tests, and the Administration's decision. As discussed earlier all of this evidence establishes that LaBarge is disabled by physical impairments and that LaBarge's physical impairments have affected her mental health. This evidence establishes that LaBarge barely makes it around her home everyday without pain, discomfort, labored breathe, and anxiety. In addition, the evidence establishes that LaBarge's physical impairments are worsen with any additional stress. In light of all this evidence, LINA decided that LaBarge is able to get herself up for work on a regular basis, execute her duties as a date entry clerk, meet her work deadlines, and manage herself back home everyday.

14. The reasoning that LINA gives for its decision to deny LaBarge long term disability benefits is insufficient. LINA based its decision by quoting different extracted excerpts from the medical opinions submitted. LINA quotes these excerpts and disregarded the rest of the opinions submitted. Under Rule 106 of the Federal Rules of Evidence, LaBarge is entitled to a complete review of all of the submitted medical evidence in its entirety.

15. In addition to lacking a proper factual basis, LINA's determination lacks a proper medical foundation. In making its decision to deny plaintiff disability benefits, LINA made no independent inquiry into LaBarge's condition. LINA did not meet with LaBarge, nor did it schedule a personal examination of the LaBarge with a physician of LINA's choosing. Since a report of a non-examining, non-treating physician should be discounted when contradicted by all other evidence in the record. See Millner v. Schweiker, 725 F.2d 243, 245 (4th Cir.1984); Browne v. Richardson, 468 F.2d 1003, 1006 (1st Cir.1972) (The report of a doctor who did not examine plaintiff "lacks the assurance of reliability that comes ... from first-hand observation and professional examination" and cannot provide substantial evidence). The findings of non-physicians should be afforded even less

weight.

16. LaBarge is entitled to long term disability benefits under the Policy as of March 13, 1999 through to the date of this opinion, and into the future within the terms of the Policy.

   A. Attorney Fees and Costs

17. LaBarge requests that she be awarded attorney's fees. Section 502(g)(1) of ERISA, 29 U.S.C. § 1132(g)(1), provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." Five policy factors must be considered before a court may award such fees in an ERISA case: (1) the offending parties' bad faith or culpability; (2) the ability of the offending parties to pay the fees; (3) the deterrent effect such an award would have on the offending parties; (4) the benefit conferred upon the claimant as a whole; and (5) the relative merits of the parties' position. See Nichol v. Pullman Standard, Inc., 889 F.2d 115, 121 (7th Cir. 1989); Ursic v. Bethlehem Mines, 719 F.2d 670, 673 (3rd Cir.1983).

18. This court finds that LINA's irresponsible consideration of LaBarge's application warrants a award of fees. In considering the first factor, LINA's decision to deny LaBarge disability benefits demonstrates bad faith and culpability. This litigation is not the result of an honest dispute between parties. The overwhelming weight of the evidence establishes that LaBarge qualified for long term disability benefits. LINA's decision, however, relied on small excerpts of medical reports, seemingly in total disregard of the totality of the evidence. LINA's actions in this case were irrational, culpable and in bad faith.

As to the second factor, this court finds that an award of reasonable attorney's fees will not overly burden LINA. In looking at the third factor, it is the intention of this court that this award will act as a deterrent to LINA from treating future applicants with the careless disregard shown

16

LaBarge and cause LINA to review future long term disability applications with the care demanded by its position of trust.

As to the fourth and fifth factors, this court finds that LaBarge's claim for disability benefits is strong in light of the evidence presented in the record. This court finds the LaBarge was diligent in applying for benefits and that an award of fees would be proper based on the benefits conferred on LaBarge as a result of this litigation. Further this court, gives great deference to the decision of the Administration which also approved an award of attorney's fees.

## CONCLUSION

For the above stated reasons, this court enters findings of fact and conclusions of law in favor of LaBarge and against LINA. LaBarge's motion for summary judgment is MOOT and LINA's motion for judgment on the administrative record is DENIED. LINA is liable to LaBarge for the payment of Policy benefits plus attorney's fees and costs.

The court directs counsel to confer in order to assist the parties to reach an agreement as to past benefits, future benefits, attorney fees and costs consistent with this opinion. The status of the agreement shall be reported at 10:00 am, on February 27, 2001. If an agreement cannot be reached by the parties, this court will consider the submissions on file, as supplemented according to the schedule that will be set at the February 27, 2001 status report. Upon review this court will make a final determination accordingly, and order entry of judgment in favor of LaBarge and against LINA thereon. All pending motions are DENIED as moot. All previous dates and schedules are moot.

ENTER:

*James F. Holderman*
JAMES F. HOLDERMAN
United States District Judge

DATE: February 5, 2001